1    WO

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Jose Abel Cabrera-Somosa,              )   CIV 14-1202-PHX-SRB (MHB)
                                            )
10              Petitioner,                 )   **REPORT AND RECOMMENDATION**
                                            )
11   vs.                                    )
                                            )
12   Charles Ryan, et al.,                  )
                                            )
13              Respondents.                )
                                            )
14   _____    )

15   TO THE HONORABLE SUSAN R. BOLTON, UNITED STATES DISTRICT COURT:

16          Petitioner Jose Abel Cabrera-Somosa, who is confined in the Arizona State Prison

17   Complex-Yuma in San Luis, Arizona, has filed a *pro se* Petition for Writ of Habeas Corpus

18   pursuant to 28 U.S.C. § 2254 (Doc. 1).  Respondents filed an Answer (Doc. 11), and

19   Petitioner filed a Reply (Doc. 14).[1]

20                            **BACKGROUND**[2]

21          On October 14, 2007, Phoenix Police Officer Bret Glidewell was patrolling north

22   Phoenix in a police cruiser.  (Exh. DD at 160-61.)  He was 22-years-old and had been an

23

24   _____

25          [1] The Court notes that after Petitioner filed his Reply, he filed a request for voluntary
     dismissal of his habeas petition.  Respondents opposed Petitioner's request arguing that
26   Petitioner's claims are procedurally defaulted and he is barred by the State's procedural rules
     from returning to state court to present said claims.
27
            [2] Unless otherwise noted, the following facts are derived from the exhibits submitted
28   with Doc. 11 – Respondents' Answer.

officer for just 7 months. (Id. at 160.)  At the intersection of 36th Street and Sweetwater, he "saw a single cab Chevy S10, light brown in color, kind of a tan-ish color" fail to stop at a stop sign. (Id. at 163-64.)  He turned on his lights to initiate a stop, but "[t]he pickup at this time failed to stop right away," and Officer Glidewell had to use his bullhorn to get the driver to pull over. (Id. at 165; Exh. BB at 5, 39.)  The officer read the license plate of the truck into the radio. (Exh. DD at 166, 169.)  When the driver eventually stopped, his "eyes were glued on his driver's hand mirror ... watching [Officer Glidewell's] actions." (Id. at 166.)

When Officer Glidewell realized the driver had "not once took his eyes off [him] ... [he] made an actual mental decision to change tactics of [his] traffic stop." (Id. at 168.) "[I]nstead of walking straight up on the vehicle, [Officer Glidewell] walked up wide, almost to the middle of the dividing line of the street," giving him "a clear observational view of the occupant, including the interior of the cab of the truck." (Id. at 170.)  This allowed him to get a view of the left side of the driver's face from "seven or so" feet away. (Id. at 175-76.) The driver initially turned his head to the right, looking out the rearview mirror, after losing sight of the officer; he then turned his body to the left and "squared up," giving Officer Glidewell "a full view of his face." (Id. at 176.)  Officer Glidewell saw the driver was a Hispanic male, in his 20s to 30s; he had black hair and sweat on his forehead. (Id. at 177.) When he turned, the driver mumbled something and Officer Glidewell saw "metal capping around his front teeth." (Id.)  He identified Petitioner in court as the individual who was driving the truck. (Id.)

When the driver turned, Officer Glidewell also saw he had a pistol in his right hand, and saw two flashes. (Id. at 176-77.)  The officer immediately reached for his gun and returned fire as the driver fled. (Id. at 182.)  Witnesses in the area heard three loud sounds, described as "bangs," or "pops," "booms" or "gunshots." (Exh. AA at 52, 56, 59, 64; Exh. BB at 6, 39.)

One of the shots hit Officer Glidewell in the chest, and he fell on his back.  The truck slowed down, and Officer Glidewell thought he was about to be "executed"; he took one last shot at the truck, and the truck drove away. (Exh. DD at 183-84; Exh. AA at 63-64, 67.)  He

worked his way back to his car, and put out "code 998" on the police radio, which indicates an officer-involved shooting. (Exh. DD at 183; Exh. AA at 95, 104, 112.) Officer Glidewell gave a description of the car and driver, stating the truck was "a 2001 brown Chevy S10, occupied by one Hispanic male, 20 to 30, black hair, thin moustache, some type of metal on his teeth, armed with a black 1911 style .45 automatic." (Exh. DD at 186; Exh. AA at 106, 126, 140.)  He later also told another officer that the side mirrors of the truck were possibly black and did not match the color of the truck.  (Exh. CC at 30.)

Officers who responded to the scene indicated that Officer Glidewell was calm under the circumstances, and that he was certain of his descriptions of the suspect and his truck. (Exh. AA at 128, 147.) Officer Glidewell was taken to the hospital; because he was wearing his bullet-proof vest, he was not seriously injured, having only slight redness on his chest. (Exh. DD at 189, 193-94.)

An intelligence analyst obtained a picture of the registered owner of the vehicle involved in the shooting, and e-mailed it to police officers in the field.  (Exh. CC at 108.) The photo did not show the registered owner's teeth.  (Id. at 117.)  A detective from the rapid deployment unit ("RDU"), which investigates officer-involved shootings, showed officer Glidewell the picture at the hospital, without informing him this was the registered owner the truck.  (Exh. AA at 85; Exh. CC at 110-12.)  The RDU officer asked officer Glidewell if he recognized the individual in the photo.  (Exh. CC at 111.)  Officer Glidewell responded, without hesitation, that "Yes.  That's the guy that shot me."  (Exh. CC at 111, 113; Exh. AA at 86-87.)

Detectives found the address to which the truck was registered, and within 20 minutes, went to that location to see if the shooter would come home.  (Ex CC at 104-05.)  At the house, Petitioner's ex-wife, Yessica Rodriguez, told police that Petitioner no longer lived there, and gave officers his new address on 6th Drive.  Petitioner's ex-wife also gave police his cell phone number, and the police pinpointed its location near the address she had given them.  (Exh. DD at 111-12, 121.)  Police sent a SWAT team to the location, and found Petitioner's truck in the driveway.  (Id. at 132-133.)

1    An officer saw Petitioner walk out the front door, and return inside. (Exh. CC at 138.)

2    The police obtained permission from another resident to search and clear the house, and

3    found Petitioner in a locked bedroom. (Id. at 139-40.) The room contained the keys to the

4    truck and the cell phone police had been tracking. (Exh. DD at 148.) The truck had a

5    different license plate than Officer Glidewell had radioed in; the original plates were on the

6    floor of the truck, with a screwdriver underneath them.[3] (Id. at 54, 56, 62.) The truck was

7    champagne-colored and had black mirrors. (Id. at 61.) Inside the driver-side door was

8    Petitioner's El Salvadoran passport. (Id. at 63.) The title of the truck showed it was

9    registered to Petitioner and the VIN number on the title matched the VIN number of the

10   truck. (Id. at 67-68.)

11   When police eventually questioned Petitioner, after advising him of his Miranda rights

12   and of his right to consulate notification, he told the interviewing officer that he had not

13   worked on October 14, 2007. (Id. at 14.) He told the officer that on that day "he had just

14   been driving around." (Id. at 14.) This initial version of events did not "account for the

15   timeframe when the shooting occurred." (Id. at 15.) He later told the officer that he had

16   eaten some food and "actually went to an apartment complex ... [a]nd at that time he had

17   loaned his truck to a friend named Julio." (Id. at 14.) Petitioner said that he remained at the

18   apartment "with friends that he couldn't identify until 6:00 p.m. when Julio brought his

19   vehicle back to him." (Id.) Petitioner did not give the officer the apartment number where

20   he was at the time he loaned his truck out to "Julio." (Id. at 21.) Petitioner claimed not to

21   know "Julio's" last name or where he lived. (Id. at 16.) He did not say where he met "Julio"

22   and gave a vague description of him. (Id. at 17.)

23

24

25   _____

26   [3] A witness had seen a pickup truck in the alley outside his house, near the area of the shooting. (Exh. CC at 16.) By the pickup truck, "there was a gentleman kneeled down with

27   a screwdriver in his hand next [to] the license plate." (Id.) The man kneeling next to the truck, "looked at [the witness] very startled and ran to the pickup and peeled out." (Id. at 16,

28   17.)

When asked about his lending his car to a stranger without knowing how to get a hold of him, Petitioner stated "that's the kind of person he is." (Id. at 18.)  Petitioner told the officer that when Julio returned with the truck, it had two bullet holes in the rear window on the driver's side, which Julio explained by saying "he had had some troubles with a guy and that he would take care of it." (Id. at 20.)  Petitioner claimed he did not report the incident to the police because he was afraid of being deported. (Id. at 22.)  An officer who did a search of Petitioner's contacts with the police found the Petitioner had called the police on multiple occasions, at least once when had been the victim of a crime.  When asked about the switched license plate on the truck, Petitioner "said he hadn't noticed it." (Id. at 22.) Petitioner "did admit to noticing that there were license plates on the ground or the floorboard," which he said were normally kept underneath the seat. (Id.)

On April 2, 2008, Petitioner was indicted on charges of: (Count 1) attempted first-degree murder, a class 2 dangerous felony; (Count 2) aggravated assault, a class 2 dangerous felony; and (Count 3) misconduct involving weapons, a class 4 felony. (Exh. A.) The State also alleged the following aggravating circumstances: (1) the offenses involved the infliction or threatened infliction of serious physical injury; (2) the offenses involved the use, threatened use or possession of a deadly weapon or dangerous instrument during the commission of the crime, specifically, a firearm; (3) the offenses caused physical, emotional, or financial harm to the victim or, if the victim died as a result of the conduct of the defendant, caused emotional or financial harm to the victim's immediate family; (4) the offenses involved lying in wait for the victim or ambushing the victim during the commission of any felony, specifically aggravated assault; (5) the defendant endangered the public safety by discharging a firearm within a residential community; (6) the defendant attempted to elude police; (7) the defendant failed to render aid to the victim; and (8) the defendant has previously been removed from the United States. (Exh. B.)

Following a motion for Rule 11 competency proceedings, the court found that Petitioner "understands the proceedings and is able to assist counsel with Defendant's defense." (Exh. C at 2.) The court also held a hearing addressing a request by Petitioner for

new counsel. (Exh. Y.) The court denied the request, finding that Petitioner's complaints "were not sufficiently 'substantial' to warrant the issuance of an order substituting counsel." (Exh. D.)

On December 31, 2008, Petitioner filed a motion to suppress both his out-of-court and his in-court identification by the victim. (Exh. E.) Petitioner asked the court to set a hearing pursuant to State v. Dessureault, 453 P.2d 951 (Ariz. 1969), citing the Fifth and Fourteenth Amendments to the United States Constitution. (Id.) Petitioner claimed that the victim's identification was not reliable, because the victim had initially identified him from a single photo on a police officer's cell phone, which he argued was as inherently suggestive as a one-man show up. (Id. at 4.)

On January 16, 2009, the court held the Dessureault hearing, outside the jury's presence. (Exh. CC at 38-88.) During the hearing, Officer Glidewell described the circumstances that led him to stop Petitioner's truck on October 14, 2007, including the fact that the truck did not initially stop, and that he had to use his bullhorn. (Id. at 41-42.) Officer Glidewell stated that Petitioner "used his driver's side mirror and proceeded to watch me at all times," which was uncommon, as people who are pulled over are usually fumbling for identification or registration. (Id. at 43.) Officer Glidewell testified that "instead of walking up on it like a normal traffic stop, [he] walked out wide toward the center line of the road so [he] could get out of the driver's line of sight." (Id. at 44.)

The officer testified that he could see Petitioner, and never lost sight of him, as he "approached the vehicle [at] almost a 90-degree angle from the driver's side window." (Id. at 47-48.) When he got within about 6-7 feet, the driver, "who [was] looking over his right shoulder ... turned [left] and gave [the officer] a full frontal view of his person." (Id. at 49.) The lighting conditions were good, there was minimal to no cloud cover, and no shadows or obstructions. (Id. at 49.) The officer said Petitioner was Hispanic, and had black hair. (Id. at 51.) The most distinguishing thing Officer Glidewell saw was "metal capping that went around [Petitioner's] teeth." (Id. at 51.) He also saw two flashes and a black 1911 .45-caliber-style pistol. (Id. at 51.) Although he described the situation as "scary and fast,"

1    Officer Glidewell testified that, he "was able to get a clear, clear look at the defendant to the

2    T, his gun ... his face, his hair, his sweat on his forehead, his teeth, the caps around his teeth,

3    his ... thin mustache." (Id. at 52, 79.)  Petitioner was asked to expose his teeth to the officer

4    during the hearing.  (Id. at 54-55.)  Officer Glidewell identified Petitioner at the hearing as

5    the individual who shot him, and he said he had no doubt whatsoever.  (Id. at 54-55, 74.)

6         Officer Glidewell explained that at the hospital, an officer held up a photo of an

7    individual on his cell phone, asking him "is this or is this not the guy," and that he

8    immediately recognized it to be the individual who had shot him.  (Id. at 61.)  The State

9    displayed the photo on a computer screen; the court admitted the photo for purposes of the

10   hearing.  (Id. at 65, 70.)  Officer Glidewell testified that he saw the photo approximately 1

11   hour and 20 minutes after he gave the description of the individual who shot him, including

12   the description of the metal on the shooter's teeth.  (Id.)

13        The court heard argument regarding the in-court identification, and ruled from the

14   bench as follows:

15        The court agrees with the defendant that as a matter of fact, this was a – what
          is called ... a one-man show-up.  I also agree with the defendant that as a
16        matter of law, this was inherently suggestive.  However, the plaintiff, the State,
          has shown by clear and convincing evidence the sufficient factors that would
17        make the identification both reliable and – sort of a gatekeeper terminology –
          and allow the in-court identification based on these facts.
18
          First, the witness did have the opportunity to view the criminal at the time of
19        the crime.  That opportunity was at once both great and excellent.  It was also
          such not only because of the circumstances but despite the circumstances; that
20        is, the officer's opportunity was significant because of what was happening.
          And the court finds, first, the witness to be both credible and persuasive, that
21        it was, despite the high emotion of the circumstances, as a result of his
          training, that he could, nevertheless, view the criminal even though the time
22        was short and the individual was, according to the witness anyways, shooting
          at him.
23
          Two, the witness's degree of attention. ... I find that there are facts in the case
24        that the witness, Officer Glidewell, had an extraordinary high degree of
          attention for all the reasons that he testified to.
25
          There's particular – a particular accuracy in his prior descriptions, and this has
26        sort of a twist on it, I think, with the metal teeth.  The officer repeatedly
          referred to those, something metal in the man's mouth.  And of significance,
27        as the State has pointed out a number of times, the offending show-up photo
          doesn't include any metal on the teeth.
28

1

2

3

4

> The officer's testimony was perhaps just a bit over the top when he said absolute, but there was at least a sufficient showing of certainty at the time of the confrontation.  I don't think the length of time here is of particular issue, but it certainly doesn't make the show-up either unreliable or suggestive.  This is particularly important in light of the fact that the witness gave a number of descriptions within minutes of being shot.

5

> So the Court will, based on those findings, conclude that the – any objection to the in-court identification or evidence of the identification at the show-up are both admissible for the jury.

6

(Id. at 86-88.)

7

8

Petitioner was tried before a jury from January 13, 2009 to January 21, 2009.  (Exh. F; Exhs. Z-EE.)  Petitioner did not testify.  Officer Glidewell identified Petitioner, in court, as the driver.  (Exh. DD. at 177-78.)  Petitioner exposed his teeth to Officer Glidewell in court, who confirmed that those were the teeth he saw on that day.  (Id. at 178.)

9

10

11

12

Petitioner also moved for dismissal of the weapons misconduct charge, arguing that there had been no evidence of an interstate nexus, as allegedly required to establish this claim.  (Id. at 208-10.)  The court denied the motion.  (Id. at 211.)

13

14

15

The jury convicted Petitioner of all three charges.  (Exh. G.; Exh. DDD at 102-104.) The jury also found the following aggravating factors: (1) threatened infliction of serious physical injury; (2) threatened use of a deadly weapon; (3) cause of physical, emotional or financial harm to the victim; (4) lying in wait or ambushing the victim during the commission of aggravated assault; and (5) endangering the public safety by discharging a firearm within a residential community.  (Exh. G.; Exh. DD at 122-126.)

16

17

18

19

20

21

The court sentenced Petitioner on March 27, 2009.  (Exh. H; Exh. FF.)  The court first heard from members of the police department about other officer shootings as well as from family members of fatal officer shootings, who discussed how difficult it was to undergo such a traumatizing event.  (Exh. FF at 4-10.)  Officer Glidewell's mother and father also spoke about what they went through when they learned their son had been shot.  (Id. at 11-18.)  Officer Glidewell spoke about how he thinks about the incident every day, and the fear he experiences when he makes a traffic stop.  (Id. at 18-23.)

22

23

24

25

26

27

28

1    The State argued that the court could impose consecutive sentences for Counts 1 and

2   2 because the separate shots constituted separate offenses under State v. Gordon, 778 P.2d

3   1204 (Ariz. 1989). (Id. at 29-31.)  The State also pointed out that 10 police officers had been

4   shot in 2007, and that Officer Glidewell is referred to as "the one who lived."  (Id. at 36.)

5   The prosecutor emphasized that this was an epidemic and that further shootings needed to

6   be deterred. (Id. at 36.)  The State asked for a maximum sentence of 42 years. (Id. at 36.)

7    Petitioner's counsel argued that most of the aggravating factors in this case were

8   subsumed within the crime. (Id. at 43.)  He also argued that there were not many people

9   around when this incident occurred, and that the victim, as a police officer, was better trained

10  and equipped to deal with this type of incident than a civilian victim would be. (Id. at 45-46.)

11  Petitioner's counsel also argued that the long sentences defendants in prior officer shootings

12  had received did not appear to have served as a deterrent. (Id. at 47.)  In mitigation, defense

13  counsel emphasized Petitioner's lack of a criminal record, and asked the court not to find

14  lack of remorse as an aggravating circumstance. (Id. at 47-48.)

15    Petitioner's counsel made the following argument regarding consecutive sentencing:

16  I'm not going to dispute the law as it's presented in [the State's sentencing
    memorandum] because I think it's accurately presented.  However, looking at

17  the issue of separate acts and separate offenses, I would just simply point out
    to this Court that although I think technically, in a very legalistic way, these

18  offenses are separate offenses and separate acts, I think from a more common
    sense, normal, ordinary person perspective, it all happened within the space of

19  a few seconds.  It all was the product of the same bad decision making ...

20  Your Honor, I think the case law legally and technically would probably
    define this as two acts.  What I'm submitting to you is that it was the product

21  of one decision.  I don't think when the shooter in this case pulled the trigger
    twice, that person was really thinking about it.  I'm sure that they were just

22  pulling the trigger.  I think they made the decision to pull the trigger.  But the
    second trigger pull may have been almost instinctual rather than calculated.

23  That's all I'm submitting to the Court.  I think what we have here is the
    product of one bad decision rather than two decisions and actions resulting

24  from that, if you understand the distinction that I'm trying to make, Your
    Honor.  So I would ask the Court to consider that.

25
26  (Id. at 48-50.) Counsel also emphasized that consecutive sentencing was not required in this

    case. (Id. at 50-51.)  He also argued that if the court were to impose consecutive sentences,
27
    then a maximum sentence would not be appropriate, given that the aggravating factors were
28

1    largely subsumed into the actual offenses, and that the presumptive sentence would be the

2    maximum sentence the court should impose.  (Id. at 52.)

3         Petitioner addressed the court, denying he had shot the officer, and discussing

4    primarily a police report, which he said showed his innocence; he claimed that his lawyer did

5    not adequately represent him.  (Id. at 52-59.)

6         The court found the fact that Petitioner had no criminal record to be a mitigating

7    factor.  (Id. at 59.)  The court found, as aggravating factors to Counts 1 and 2: the harm to

8    the victim, endangerment of public safety and the fact that this was a residential area, an

9    attempt to elude police, a failure to render aid, and the need to deter other similar crimes.  (Id.

10   at 59.)  With regard to Count 3, the court found, as aggravating factors: harm to the victim,

11   and Petitioner's attempt to elude police.  (Id.)  The court sentenced Petitioner to 20 years in

12   the Department of Corrections for Count 1 (attempted murder).  (Exh. H; Exh. FF at 62.)

13   The court also sentenced Petitioner to 2.5 years in the Department of Corrections for Count

14   3 (weapons misconduct), to be served concurrently with Count 1.  (Exh. H; Exh. FF at 62.)

15   For Count 2, the court imposed a 14-year sentence, to be consecutive to Counts 1 and 3.

16   (Exh. H; Exh. FF at 62.)  Petitioner received credit for 529 days.  (Exh. H; Exh. FF at 62.)

17   Also, the sentences for Counts 1 and 2 were for flat time, pursuant to A.R.S. § 13-604(P).

18   (Exh. H; Exh. FF at 63.)

19        On April 16, 2009, Petitioner filed a notice of appeal.  (Exh. I.)  On March 29, 2010,

20   he filed an opening brief, claiming the trial court erred in denying his motion for judgment

21   of acquittal as to the weapons misconduct charge, arguing that the government was required

22   to, but failed to prove that Petitioner possessed a gun or ammunition that had a nexus to

23   interstate commerce.  (Exh. J.)  The State conceded that it had not provided sufficient

24   evidence of a nexus to interstate commerce, and the Arizona Court of Appeals reversed his

25   weapons misconduct conviction, but affirmed the other convictions.  (Exhs. K, L.)  The

26   Arizona Court of Appeals issued the mandate on November 8, 2010.  (Exh. M.)

27        On October 27, 2010, Petitioner filed a notice of post-conviction relief.  (Exh. N.)  On

28   August 26, 2011, after requesting and receiving extensions from the court, Petitioner, through

counsel, filed a petition for post-conviction relief. (Exh. O.) Petitioner asserted two claims: (1) that his trial and appellate attorneys had provided ineffective assistance by failing to object to or appeal the court's imposition of consecutive sentences for two offenses arising from the same action in violation of A.R.S. § 13-116; (2) that appellate counsel provided ineffective assistance by failing to challenge the court's ruling admitting his in-court identification, because the out-of-court identification was suggestive. (Id.)

On December 20, 2011, the State filed a response to the PCR petition. (Exh. P.) The State argued, in part, that Petitioner's trial counsel had raised several arguments challenging the consecutive sentences the court imposed.  The State also argued that Petitioner's appellate counsel would not have erred in determining that consecutive sentencing was permissible and declining to raise the issue on appeal.  The State also argued that appellate counsel would not have been deficient in declining to challenge the court's determination that Officer Glidewell was credible and persuasive because of his training and degree of attention, and the fact he noticed Petitioner's metal teeth at the time of the shooting, which were not visible in the photo he had been shown.  Finally, the State argued that even if counsel were deficient for failing to raise the issue, Petitioner was not prejudiced as the court of appeals would not have found the trial court abused its discretion in concluding the identification was reliable, given the witness's opportunity to view the attacker, the degree of attention he gave, and the certainty of his identification.

On March 19, 2012, the court issued an order dismissing the PCR petition. (Exh. R.) The court found that Petitioner's counsel was not ineffective for failing object to or appeal the court's imposition of consecutive sentences.  The court noted that although Arizona law bars consecutive sentences for multiple crimes arising from a single act, in this case there were two separate shots, thus supporting the consecutive sentences.  (Id. at 3-4.)

The court also noted that trial counsel "not only objected to the possibility of consecutive sentences, he argued as well as he could in Petitioner's favor given the facts as they existed and the law that applied. ... There was a deliberate and carefully-crafted trial strategy.  Sentencing arguments were skillfully presented." (Id. at 3-4.) The court held that

1    defense counsel was not ineffective "simply because the State's evidence and arguments

2    prevailed." (Id. at 4.)   The court also found that the facts, as the court viewed them,

3    compelled distinct – and consecutive – sentences for separate crimes:

4            After Mr. Cabrera-Somosa shot his victim he wasn't finished with him; he
             decided to shoot at him again. ... Petitioner does not deserve to be rewarded
5            merely because it just so happened that his second shot missed.  This second
             shot was a second crime.  A second crime means Petitioner deserved exactly
6            what he got: a second sentence.  It would be an affront to common sense,
             fairness and all decency if Petitioner received a 'free pass' on his second
7            conviction.

8    (Id. at 4.)

9            The PCR court also denied Petitioner's claim that his appellate counsel had provided

10   ineffective assistance for not raising the issue of consecutive sentences on appeal, because

11   "no facts are presented that would allow a conclusion that counsel was ineffective." (Id.)

12   The court found that Petitioner could not establish prejudice as "there is no likelihood that

13   the Court of Appeals would have found an abuse of discretion." (Id.)

14           Similarly, the court denied Petitioner's claim that his appellate counsel had been

15   ineffective for failing to challenge the court's admission of his in-court identification.  The

16   PCR court noted that Officer Glidewell testified that he had a full view of the driver of the

17   vehicle as he approached it, that he saw Petitioner from 6 or 7 feet away and noticed metal

18   capping on his teeth.  (Id. at 4-5.)   The court noted that Officer Glidewell "identified

19   Defendant and also his teeth," in court.  (Id.)   The PCR court further noted that Officer

20   Glidewell testified about his prior identification of Petitioner, and was cross-examined about

21   it.  The court found Petitioner failed to meet either Strickland prong on this claim:

22           Appellate counsel, who can – and who of course must – choose which issues
             to appeal, was not ineffective for failing to raise the identification issue.  In
23           addition, even if counsel's performance was deficient, Petitioner was not
             prejudiced because under these circumstances, there is no likelihood that the
24           Court of Appeals would have found an abuse of discretion.

25   (Id. at 5.)

26           On April 26, 2012, Petitioner filed a petition for review in the Arizona Court of

27   Appeals.  (Exh. S.)   The petition consisted entirely of a copy of pages 2-20 of the PCR

28   petition, with a handwritten first page, including the caption, and a handwritten final page,

1    consisting of the certificate of mailing.  (Id.)  The State filed a response, asking the court to

2    deny review because the "petition for review [was] facially deficient" because Petitioner had

3    "merely changed the title of the petition for post-conviction relief he filed in the trial court

4    to 'petition for review.'"  (Exh. T.)  Thus, Petitioner "fail[ed] to explain how the trial court

5    abused its discretion when it considered and dismissed each of the claims as nonmeritorious,"

6    and "[did] not explain the basis on which he seeks review."  (Id. at 2.)

7         On May 22, 2013, the case was transferred to Division Two.  (Exh. U.)  On July 31,

8    2013, the Arizona Court of Appeals denied review, citing Rule 32.9(c)(1).  (Exh. V.)  The

9    court found that Petitioner failed to follow the procedural requirements of the rule when he

10   "attache[d] pages from the post-conviction relief petition he filed below," but did "not

11   address the court's summary dismissal or advance any basis for concluding that ruling was

12   incorrect or an abuse of discretion."  (Id.)  Petitioner did not seek review in the Arizona

13   Supreme Court[4] and the mandate was issued on October 15, 2013.[5]  (Exh. W.)

14        On June 2, 2014, Petitioner filed the instant Petition for Writ of Habeas Corpus.  (Doc.

15   1.)  Petitioner raises two grounds for relief.  In Ground One, he alleges that he was denied

16   his Sixth Amendment right to the effective assistance of trial and appellate counsel because

17   his attorneys "should have objected to and raised the issue of sentencing of two offenses

18   arising from the same action ... being made consecutive."  In Ground Two, he asserts that he

19   received ineffective assistance of counsel on appeal because his attorney failed to raise an

20   out-of-court identification issue with the appellate court.

21

22

23        [4] Petitioner initially sought an extension to file a petition for review in the Arizona
24   Supreme Court, but did not ever file a petition.  (Exh. X.)

25        [5] Petitioner has since filed a request for transcripts, which the court denied.  (Exhs.
26   GG, HH, II.)  Petitioner also filed motions for reconsideration, which were also denied.
     (Exhs. JJ, KK, LL.)  On December 17, 2013, Petitioner also filed a notice of post-conviction
27   relief, in which he claims his PCR counsel failed to provide him with transcripts, and a
     "motion for a delayed Rule 32 post-conviction relief."  (Exhs. MM, NN.)  On February 24,
28   2014, the PCR was assigned to a judge for ruling.  (Exh. OO.)

- 13 -

1    Respondents filed an Answer on September 2, 2014 (Doc. 11), and Petitioner filed a

2    Reply on September 24, 2014 (Doc. 14).

3                                   **DISCUSSION**

4    In their Answer, Respondents contend that the grounds for relief set forth in

5    Petitioner's habeas petition are procedurally defaulted.  As such, Respondents request that

6    the Court deny and dismiss Petitioner's habeas petition with prejudice.

7    A state prisoner must exhaust his remedies in state court before petitioning for a writ

8    of habeas corpus in federal court.  See 28 U.S.C. § 2254(b)(1) and (c); Duncan v. Henry, 513

9    U.S. 364, 365-66 (1995); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991).  To

10   properly exhaust state remedies, a petitioner must fairly present his claims to the state's

11   highest court in a procedurally appropriate manner.  See O'Sullivan v. Boerckel, 526 U.S.

12   838, 839-46 (1999).  In Arizona, a petitioner must fairly present his claims to the Arizona

13   Court of Appeals by properly pursuing them through the state's direct appeal process or

14   through appropriate post-conviction relief.  See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th

15   Cir. 1999); Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir. 1994).

16   Proper exhaustion requires a petitioner to have "fairly presented" to the state courts

17   the exact federal claim he raises on habeas by describing the operative facts and federal legal

18   theory upon which the claim is based.  See, e.g., Picard v. Connor, 404 U.S. 270, 275-78

19   (1971) ("[W]e have required a state prisoner to present the state courts with the same claim

20   he urges upon the federal courts.").  A claim is only "fairly presented" to the state courts

21   when a petitioner has "alert[ed] the state courts to the fact that [he] was asserting a claim

22   under the United States Constitution." Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000)

23   (quotations omitted); see Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner

24   fails to alert the state court to the fact that he is raising a federal constitutional claim, his

25   federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

26   A "general appeal to a constitutional guarantee," such as due process, is insufficient

27   to achieve fair presentation.  Shumway, 223 F.3d at 987 (quoting Gray v. Netherland, 518

28   U.S. 152, 163 (1996)); see Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005)

("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory."). Similarly, a federal claim is not exhausted merely because its factual basis was presented to the state courts on state law grounds – a "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." Shumway, 223 F.3d at 988 (quotations omitted); see Picard, 404 U.S. at 275-77.

Even when a claim's federal basis is "self-evident," or the claim would have been decided on the same considerations under state or federal law, a petitioner must still present the federal claim to the state courts explicitly, "either by citing federal law or the decisions of federal courts." Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000) (quotations omitted), amended by 247 F.3d 904 (9th Cir. 2001); see Baldwin v. Reese, 541 U.S. 27, 32 (2004) (claim not fairly presented when state court "must read beyond a petition or a brief ... that does not alert it to the presence of a federal claim" to discover implicit federal claim).

Additionally, under the independent state grounds principle, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate state ground. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). The United States Supreme Court has explained:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

Id. at 730-31. A petitioner who fails to follow a state's procedural requirements for presenting a valid claim deprives the state court of an opportunity to address the claim in much the same manner as a petitioner who fails to exhaust his state remedies. Thus, in order to prevent a petitioner from subverting the exhaustion requirement by failing to follow state procedures, a claim not presented to the state courts in a procedurally correct manner is deemed procedurally defaulted, and is generally barred from habeas relief. See id. at 731-32.

Claims may be procedurally barred from federal habeas review based upon a variety of factual circumstances. If a state court expressly applied a procedural bar when a petitioner

1   attempted to raise the claim in state court, and that state procedural bar is both

2   "independent"[6] and "adequate"[7] – review of the merits of the claim by a federal habeas court

3   is barred.  See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("When a state-law default

4   prevents the state court from reaching the merits of a federal claim, that claim can ordinarily

5   not be reviewed in federal court.") (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977)

6   and Murray v. Carrier, 477 U.S. 478, 485-492 (1986)).

7         Moreover, if a state court applies a procedural bar, but goes on to alternatively address

8   the merits of the federal claim, the claim is still barred from federal review.  See Harris v.

9   Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of

10  a federal claim in an *alternative* holding.  By its very definition, the adequate and

11  independent state ground doctrine requires the federal court to honor a state holding that is

12  a sufficient basis for the state court's judgment, even when the state court also relies on

13  federal law. ... In this way, a state court may reach a federal question without sacrificing its

14  interests in finality, federalism, and comity.") (citations omitted); Bennett v. Mueller, 322

15  F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural rule is not

16  undermined where, as here, the state court simultaneously rejects the merits of the claim.")

17  (citing Harris, 489 U.S. at 264 n.10).

18        A procedural bar may also be applied to unexhausted claims where state procedural

19  rules make a return to state court futile.  See Coleman, 501 U.S. at 735 n.1 (claims are barred

20  from habeas review when not first raised before state courts and those courts "would now

21  find the claims procedurally barred"); Franklin v. Johnson, 290 F.3d 1223, 1230-31 (9th Cir.

22  2002) ("[T]he procedural default rule barring consideration of a federal claim 'applies only

23  when a state court has been presented with the federal claim,' but declined to reach the issue

---

25  [6] A state procedural default rule is "independent" if it does not depend upon a federal
26  constitutional ruling on the merits.  See Stewart v. Smith, 536 U.S. 856, 860 (2002).

27  [7] A state procedural default rule is "adequate" if it is "strictly or regularly followed."
28  Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quoting Hathorn v. Lovorn, 457 U.S. 255, 262-53 (1982)).

- 16 -

1  for procedural reasons, or 'if it is clear that the state court would hold the claim procedurally

2  barred.'") (quoting <u>Harris</u>, 489 U.S. at 263 n.9).

3       In Arizona, claims not previously presented to the state courts via either direct appeal

4  or collateral review are generally barred from federal review because an attempt to return to

5  state court to present them is futile unless the claims fit in a narrow category of claims for

6  which a successive petition is permitted.  <u>See</u> Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a) (precluding

7  claims not raised on appeal or in prior petitions for post-conviction relief), 32.4(a) (time bar),

8  32.9(c) (petition for review must be filed within thirty days of trial court's decision).  Arizona

9  courts have consistently applied Arizona's procedural rules to bar further review of claims

10 that were not raised on direct appeal or in prior Rule 32 post-conviction proceedings.  <u>See,</u>

11 <u>e.g.</u>, <u>Stewart</u>, 536 U.S. at 860 (determinations made under Arizona's procedural default rule

12 are "independent" of federal law); <u>Smith v. Stewart</u>, 241 F.3d 1191, 1195 n.2 (9th Cir. 2001)

13 ("We have held that Arizona's procedural default rule is regularly followed ["adequate"] in

14 several cases.") (citations omitted), <u>reversed on other grounds</u>, <u>Stewart v. Smith</u>, 536 U.S.

15 856 (2002); <u>see also</u> <u>Ortiz v. Stewart</u>, 149 F.3d 923, 931-32 (rejecting argument that Arizona

16 courts have not "strictly or regularly followed" Rule 32 of the Arizona Rules of Criminal

17 Procedure); <u>State v. Mata</u>, 185 Ariz. 319, 334-36, 916 P.2d 1035, 1050-52 (Ariz. 1996)

18 (waiver and preclusion rules strictly applied in post-conviction proceedings).

19      The federal court will not consider the merits of a procedurally defaulted claim unless

20 a petitioner can demonstrate that a miscarriage of justice would result, or establish cause for

21 his noncompliance and actual prejudice.  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995);

22 <u>Coleman</u>, 501 U.S. at 750-51; <u>Murray</u>, 477 U.S. at 495-96.  Pursuant to the "cause and

23 prejudice" test, a petitioner must point to some external cause that prevented him from

24 following the procedural rules of the state court and fairly presenting his claim.  "A showing

25 of cause must ordinarily turn on whether the prisoner can show that some objective factor

26 external to the defense impeded [the prisoner's] efforts to comply with the State's procedural

27 rule.  Thus, cause is an external impediment such as government interference or reasonable

28 unavailability of a claim's factual basis." <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1052 (9th Cir.

1   2004) (citations and internal quotations omitted).  Ignorance of the State's procedural rules

2   or other forms of general inadvertence or lack of legal training and a petitioner's mental

3   condition do not constitute legally cognizable "cause" for a petitioner's failure to fairly

4   present his claim.  Regarding the "miscarriage of justice," the Supreme Court has made clear

5   that a fundamental miscarriage of justice exists when a Constitutional violation has resulted

6   in the conviction of one who is actually innocent.  See Murray, 477 U.S. at 495-96.

7           The Court finds that Petitioner's claims are procedurally barred because he failed to

8   comply with state's procedural requirements and fairly present his claims to the Arizona

9   Court of Appeals.  Specifically, the court of appeals denied review of Petitioner's petition

10  for review of the PCR Court's order dismissing his PCR petition, finding that he did not

11  "address the court's summary dismissal or advance any basis for concluding that ruling was

12  incorrect or an abuse of discretion," in violation of Rule 32.9(c)(1) of the Arizona Rules of

13  Criminal Procedure.  (Exh. V.)

14          Since he failed to comply with the procedural requirements of Rule 32.9(c), Petitioner

15  did not fairly present his claims to the state court.  See, e.g., Wood v. Ryan, 693 F.3d 1104

16  (9th Cir. 2012) (finding habeas petitioner did not fairly present his claims to appellate court

17  where he failed to comply with Rule 32.9(c)(1) by incorporating by reference his state PCR

18  petition).  Because the appellate court applied a procedural bar to avoid consideration of the

19  merits, Petitioner's claims are procedurally defaulted.  See Ylst v. Nunnemaker, 501 U.S.

20  797, 802-05 (1991); Insyxiengmay v. Morgan, 403 F.3d 657, 665 (9th Cir. 2005) (procedural

21  default "applies to bar federal habeas review when the state court has declined to address the

22  petitioner's federal claims because he failed to meet state procedural requirements"); see also

23  Simmons v. Schriro, 187 Fed. App'x. 753, 754 (9th Cir. 2006) (holding that Arizona's

24  procedural rules are "clear" and "well-established"); Miloni v. Schriro, 2006 WL 1652578,

25  *5 (D. Ariz. Jun. 7, 2006) (concluding that a procedural ruling based on Rule 32.9(c) is

26  adequate); State v. French, 7 P.3d 128, 131 (Ariz. Ct. App. 2000) (summarily rejecting

27  claims for failure to comply with Rule 32.9), disapproved of on other grounds by Stewart v.

28

- 18 -

1  Smith, 46 P.3d 1067, 1071 (Ariz. Ct. App. 2002); State v. Carriger, 692 P.2d 991, 995 (Ariz.

2  1984) (observing that "[p]etitioners must strictly comply with Rule 32 or be denied relief").

3      Furthermore, although Petitioner presented his claims in his initial PCR petition and

4  attempted, but failed, to present them to the Arizona Court of Appeals, he failed to fairly

5  present his claims to each appropriate state court.  See Baldwin, 541 U.S. 27, 29 (2004)

6  (petitioner must fairly present his claim "in each appropriate state court"); O'Sullivan, 526

7  U.S. at 844 (petitioner must invoke "one complete round of the State's established review

8  process"); Swoopes, 196 F.3d at 1010; Roettgen, 33 F.3d at 38.  Because it would be futile

9  for Petitioner to return to state court to properly present his claims, they are procedurally

10  defaulted.

11      Petitioner has not established grounds to excuse the procedural default by a showing

12  of cause and prejudice, and he has not argued a fundamental miscarriage of justice.  As stated

13  previously, ignorance of the State's procedural rules or other forms of general inadvertence

14  or lack of legal training and a petitioner's mental condition do not constitute legally

15  cognizable "cause" for a petitioner's failure to fairly present his claim.  And, although

16  "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish

17  cause for a prisoner's procedural default of a claim of ineffective assistance at trial,"

18  Martinez v. Ryan, —— U.S. ——, 132 S.Ct. 1309, 1315 (2012), Martinez does not apply to

19  this case.[8]  Petitioner's PCR counsel presented each of his habeas claims before the PCR

20  court, and the court found that Petitioner had failed to satisfy both prongs of the Strickland

21  test on each claim.  As such, the court found that Petitioner failed to demonstrate any

22  colorable claim entitling him to post-conviction relief.  Petitioner then failed to comply with

23  the state's procedural requirements and failed to fairly present his claims in his petition for

24  review.  Accordingly, Martinez is not applicable.

25

26

27      [8]  In Nguyen v. Curry, 736 F.3d 1287, 1293 (9th Cir. 2013), the Ninth Circuit Court
of Appeals extended Martinez to also apply to underlying claims of ineffective assistance of
28  appellate counsel.

**CONCLUSION**

Grounds One and Two set forth in Petitioner's habeas petition are procedurally defaulted.  Thus, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.  The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  See Rule 72, Federal Rules of Civil Procedure.

DATED this 29th day of October, 2014.

Michelle H. Burns
United States Magistrate Judge